**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TRACY DONOVAN,<br><br>Plaintiff,<br><br>v.<br><br>JENNIFER HUTCHINS and JEREMY DIPIETRO,<br><br>Defendants. | : | Civil No. 3:25-CV-1094 (AWT) |

**RULING ON MOTION TO FILE SECOND AMENDED COMPLAINT**

Plaintiff Tracy Donovan has moved for leave to file a second amended complaint. For the reasons set forth below, her motion is being denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Tracy Donovan filed an Amended Complaint and Request for Injunction ("Amended Complaint") (ECF No. 43) asserting claims against defendants Jennifer Hutchins, in her official and individual capacities, and Jeremy DiPietro, in his official and individual capacities. Hutchins was at all relevant times Director of the Northeastern Connecticut Council of Governments ("NCCOG") Animal Services. DiPietro was at all relevant times a Connecticut Department of Agriculture animal control officer.

The extensive factual and procedural history of this case

prior to the date the plaintiff filed the Amended Complaint was summarized by the Appellate Court of Connecticut as follows:

> [Donovan] is the owner of a single-family residence in Woodstock, at which property she resided along with ninety-six dogs, two goats, two exotic birds, two cats, and one rabbit. Following numerous complaints concerning the animals on the property, an animal control officer . . . conducted a welfare check. Upon arriving at the property, the animal control officer observed that the property was in an unsanitary state and the house emitted an overwhelming odor of urine and feces. After knocking on the front and rear doors of the house and receiving no answer other than the sound of twenty to thirty dogs barking, some sounding distressed, the animal control officer peered through a window and observed numerous small dogs in cages and crates, together with several underweight and extremely dirty dogs running about the residence. These observations of the animal control officer served as a basis for an affidavit submitted in support of an application for a search and seizure warrant for [Donovan]'s property, which warrant was granted by a judge of the Superior Court. On July 10, 2024, the animals were seized by [NCCOG] pursuant to the warrant.
>
> On July 23, 2024, [NCCOG] filed a verified petition seeking permanent ownership of the animals pursuant to § 22-329a (c), as well as an application for an immediate ex parte order of temporary care and custody. The court, Cobb, J., granted the application for an immediate ex parte order of temporary care and custody the following day and ordered a hearing to be held on August 5, 2024, at which [Donovan] had to show cause as to why the order of temporary care and custody should not continue.
>
> At the commencement of the August 5, 2024 hearing, counsel for [Donovan] made an oral motion to suppress evidence, arguing that the subject search and seizure warrant was invalid due to the warrantless search of the premises conducted by an animal control officer peering through a window during a welfare check. [Donovan] filed a memorandum in support of her motion to suppress and dismiss on August 7, 2024. The court, Chadwick, J., denied the motion to suppress on August 14, 2024, reasoning that the search and seizure warrant was valid

because the animal control officer was not within the building or its curtilage at the time of his observations but, rather, the conditions as viewed through the window fell within the plain view exception to the fourth amendment warrant requirement.

After the hearing on August 5, 2024, which continued on August 13, 2024, the court, Chadwick, J., issued an August 14, 2024 order vesting temporary custody of the animals with [NCCOG]. In concluding that [Donovan] neglected the animals and treated them cruelly, the court made the following factual findings. All ninety-six dogs were flea ridden, with many displaying long matted and filthy fur (including urine and feces), and some dogs displaying hair loss, dehydration, overgrown nails, and urine scalding. Many of the dogs were kept in crates, in some instances holding as many as two, three, or four dogs, without proper water or food. At the rear of the residence, there were two thin and lethargic goats in a small shed, which contained approximately three inches of wet goat feces and shavings and the two small water bowls in the area were dry and caked with dirt. Two exotic birds were in cages with no food or water. They had overgrown beaks and nails, with one being underweight and having plucked away some of its feathers. The two cats were covered in fleas, without access to water, food, or a litter box. The rabbit was a wild animal that [Donovan] improperly took into her possession and control. [Donovan] allowed the residence to be riddled with animal feces and shavings, and the residence was not properly ventilated, resulting in a noxious odor that could be detected many feet from the exterior of the residence. [Donovan] did not provide the animals with adequate food or water. [Donovan] did not provide the animals with necessary or proper care, including veterinary care.

The order of temporary care and custody required [Donovan] to relinquish ownership of her animals or post a surety or cash bond with [NCCOG] and to pay all the expenses incurred by [NCCOG] for caring for the animals at the rate of $15 per animal, per day. The order also required [Donovan] to pay all veterinary expenses incurred. Thereafter, [NCCOG] filed a motion for order of permanent ownership.

> Subsequently, a hearing was held on January 7, 2025, concerning [NCCOG]'s petition seeking permanent custody of the animals. Prior to that hearing, [NCCOG] filed a motion for order of judicial notice, seeking to have Judge Baio take judicial notice of the exhibits, testimony, and transcripts of the August 5 and 13, 2024 temporary custody proceedings and Judge Chadwick's attendant factual findings and legal conclusions. [Donovan] filed an objection. Judge Baio granted the motion.
>
> At the January 7, 2025 hearing, Judge Baio restated that judicial notice was being taken of the proceedings, evidence and findings from the initial show cause hearing that resulted in an order vesting temporary custody with [NCCOG].
>
> Relying on an amended affidavit of Hutchins, which [NCCOG] filed in connection with the permanent ownership hearing, as well as the materials from the prior proceeding concerning temporary custody of which judicial notice had been taken, [NCCOG] rested. The only witness to testify at the hearing was [Donovan].
>
> Following the hearing, Judge Baio issued a January 24, 2025 memorandum of decision vesting permanent ownership of the animals with [NCCOG]. The court noted that, of the remaining eighty-one animals, [Donovan] only posted bond for forty-four animals. The court determined that permanent ownership of the animals for which bond had not been posted vested with [NCCOG]. Regarding the forty-four animals for which bond had been posted, the court determined that [NCCOG] met its burden of proving neglect or cruelty by a fair preponderance of the evidence and that [Donovan] failed to show cause why permanent ownership should not vest with [NCCOG]. The court also ordered [Donovan] to pay $226,775, representing the $15 per day cost for each of the animals from the July 10, 2024 seizure through the date of the order vesting permanent ownership. This appeal followed.

<u>Ne. Connecticut Council of Governments Animal Servs. ex rel. Hutchins v. Donovan</u>, 237 Conn. App. 812, 813-17, <u>cert. denied,</u> 354 Conn. 940, 355 A.3d 65 (2026).

The plaintiff was arrested on criminal charges on August

21, 2024, and the state criminal case against her is still pending in the Connecticut Superior Court. See State of Connecticut v. Tracy Donovan, No. W11D-CR24-0191648-S (Super. Ct. Aug. 22, 2024). The plaintiff is charged with dozens of counts of misdemeanor animal cruelty in violation of Connecticut General Statutes § 53-247(a). After the plaintiff's arrest on those charges in August 2024, WINY Radio and Gary Osbrey published her name, mugshot, and interior property photographs on their broadcasting and social media platforms.

In the Amended Complaint, where the plaintiff was required to state facts underlying her claims, Donovan wrote:

> On July 10, 2024, state police and animal control kicked in my door and began taking all of my pets. Their search and seizure warrant was shown to be illegal, based on hearsay, lies and Jeremy DiPietro peering in a back window of my home, 12 ft off the ground. The warrant and seizure were based on lies that my animals had no food/water and were in peril. My pets have lived in tiny cages in a dark shed at NECCOG for a year, never let out. Their hired vet claimed that 5 of my pets were euthanized [on] July 10, 2024 for grave illness, but their own necropsy reports prove this untrue.

(Am. Compl. at 5.)

In the Amended Complaint, where the plaintiff was asked to state briefly "what damages or other relief the plaintiff asks the court to order," Donovan wrote: "I seek the return of my pets." Id.

Defendants Hutchins and DiPietro moved to dismiss the Amended Complaint. In addition to filing an opposition to the

motions to dismiss, the plaintiff filed the instant motion. Hutchins' motion to dismiss was granted because the plaintiff's claim against her is barred by the Rooker-Feldman doctrine. DiPietro's motion to dismiss was granted because the plaintiff failed to serve him in his individual capacity and DePietro, in his official capacity, lacks the ability to comply with any court order directing that the plaintiff's animals be returned to her.

The plaintiff submitted a Proposed Second Amended Complaint (ECF No. 86) in support of the present motion for leave to file a second amended complaint. The Proposed Second Amended Complaint names 11 defendants, plus 10 unnamed John Doe defendants. It has 14 counts as follows:

> Count I, Violation of the Fourth Amendment (42 U.S.C. § 1983) – Fabricated Warrant / Unlawful Seizure, against defendants Hutchins, DiPietro, and Rivers;
>
> Count II, Monell Liability (42 U.S.C. § 1983) – NCCOG Policy and Custom, against defendant NCCOG;
>
> Count III, Monell Liability (42 U.S.C. § 1983), against defendant Town of Woodstock;
>
> Count IV, Individual Capacity Liability (42 U.S.C. § 1983), against defendant Paquette, individually;
>
> Count V, Individual Capacity Liability (42 U.S.C. § 1983), against defendant Hutchins, individually;
>
> Count VI, Individual Capacity Liability (42 U.S.C. § 1983), against defendant DiPietro, individually;
>
> Count VII, Individual Capacity Liability (42 U.S.C. § 1983), against defendant Rivers, individually;

> Count VIII, Civil Conspiracy (42 U.S.C. § 1985), against defendants Hutchins, DiPietro, Rivers, Paquette, Town of Woodstock, NECCOG, and Pacheco;
>
> Count IX, First Amendment Retaliation (42 U.S.C. § 1983), against defendants Hutchins, Rivers, Paquette, NECCOG, and Town of Woodstock;
>
> Count X, Defamation, against defendants WINY Radio, Gary Osbrey, Rivers, and Crystal Adams;
>
> Count XI, Fraud and False Testimony, against defendants Casey Pacheco, D.V.M., and Norwichtown Veterinary Hospital;
>
> Count XII, Veterinary Negligence and Wrongful Death of Animals, against defendants Casey Pacheco, D.V.M., and Norwichtown Veterinary Hospital;
>
> Count XIII, Violation of the Fourteenth Amendment Due Process (42 U.S.C. § 1983) – Civil Forfeiture before Criminal Trial, against defendants Hutchins, Rivers, NECCOG, Paquette, and Town of Woodstock;
>
> Count XIV, Breach of Fiduciary Duty / Fourth Amendment Agency / Civil Conspiracy, against defendants Scott Pempek, in his individual and official capacities.

(ECF No. 86, Proposed Second Am. Compl.)

On September 1, 2026, the plaintiff withdrew Paragraph B(i) of the Prayer for Relief in the Proposed Second Amended Complaint, which requests the return of her surviving animals, and withdrew any other request in that pleading for return of the animals seized on July 10, 2024. (See ECF No. 110.)

## II. LEGAL STANDARD

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the

opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to file an amended complaint should not be denied "unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

"An amendment is considered 'futile' if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis." Faryniarz v. Ramirez, 62 F.Supp.3d 240, 249 (D. Conn. 2014).

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). See also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) ("[T]he court must assume the factual allegations in the complaint to be true, 'even if [they are] doubtful in fact' . . . ." (citation omitted)). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007). "On a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" Id. (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

When interpreting the allegations in a pro se complaint, the court applies "less stringent standards than [those applied to] formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Branham v. Meachum, 77 F.3d 626, 628-29 (2d Cir. 1996). Furthermore, the court should interpret the plaintiff's complaint "to raise the strongest arguments [it] suggest[s]." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). "Nonetheless, a pro se complaint must state a plausible claim for relief." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (citing Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009)).

**III. DISCUSSION**

Defendants Hutchins and DiPietro contend that the plaintiff's motion for leave to file a second amended complaint should be denied, because the proposed amendments are futile and

would not survive a Rule 12(b)(6) motion to dismiss. The court agrees.

The plaintiff has withdrawn her prayer for injunctive relief and seeks monetary damages only. Therefore, the court does not address defendant Hutchin's argument with respect to Younger abstention. See Rivers v. McLeod, 252 F.3d 99, 101-02 (2d Cir. 2001) ("[A]pplication of the Younger doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983[.]").

### A. Proposed Count I

Count I is a claim, brought pursuant to 42 U.S.C. § 1983, that defendants Hutchins, DiPietro, and Rivers violated the plaintiff's Fourth Amendment rights because "[t]he warrant used to seize Plaintiff's animals on July 10, 2024 was not supported by probable cause"; the plaintiff maintains the warrant was obtained based on fabricated evidence. (Proposed Second Am. Compl. ¶ 70.) The plaintiff alleges that the warrant was based on:

> (a) an affidavit by John Blackburn IV, a California resident who had never visited Plaintiff's property and therefore could not have personally observed the conditions he described; (b) physical observations by DiPietro that were physically impossible given his documented position at the time; (c) anonymous complaints that NECCOG cannot identify and therefore cannot verify; and (d) photographs obtained through a breach of professional trust by appraiser Pempek.

Id.

The plaintiff alleges that "[u]nder Franks v. Delaware, 438 U.S. 154 (1978), a warrant issued on the basis of deliberately false or recklessly misleading statements in the supporting affidavit is void. When the false statements are set aside, the remaining content of the affidavit fails to establish probable cause." (Proposed Second Am. Compl. ¶ 71.)

"[I]ssue preclusion[] prevents a party from relitigating an issue that has been determined in a prior suit." LaSalla v. Doctor's Assocs., Inc., 278 Conn. 578, 590 (2006) (quoting Virgo v. Lyons, 209 Conn. 497, 501 (1988)). "Issue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment." Cumberland Farms, Inc. v. Town of Groton, 262 Conn. 45, 58 (2002).

Here, the issue of whether the statement by the animal control officer about what he observed was a credible basis for the warrant was actually litigated in the state court proceedings, and that determination was essential to the judgment against Donovan. This fact is reflected in the opinion of the Appellate Court of Connecticut, which recounts that after the animal control officer knocked on the front door and rear door of the house and received no answer, "the animal control officer peered through a window" and the "observations of the

animal control officer served as a basis for an affidavit submitted in support of an application for a search and seizure warrant for the defendant's property, which warrant was granted by a judge of the Superior Court." Donovan, 237 Conn. App. at 814.

The plaintiff is correct that under Franks, when "the affidavit's false material [is] set to one side, [and] the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Franks, 438 U.S. at 156. But, even if the information referred to in clauses (a), (c) and (d) of ¶ 70 of the Proposed Second Amended Complaint are not taken into account, there was still probable cause under clause (b) for the warrant pursuant to which the plaintiff's animals were seized.

Consequently, the plaintiff has not alleged facts that could establish that her Fourth Amendment rights were violated when her animals were seized on July 10, 2024 pursuant the warrant issued by the Superior Court. Therefore, the amendment proposed in Count I is futile.

**B. Proposed Counts II and III**

Count II is a claim against defendant NECCOG, under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), for a violation of

the plaintiff's rights under the Fourth Amendment. The plaintiff alleges that Jim Rivers, who is a "final policymaker with respect to Animal Services operations," "publicly ratified the unconstitutional seizure of Plaintiff's animals . . . ." (Proposed Second Am. Compl. ¶¶ 75, 77.)

Count III is a claim against defendant Town of Woodstock, also under Monell, for violation of the plaintiff's rights under the Fourth Amendment. The plaintiff alleges that "First Selectman Chandler Paquette is the Town's final policymaker with respect to its participation in the conduct alleged [in the Proposed Second Amended Complaint]." (Proposed Second Am. Compl. ¶ 80.) The plaintiff alleges further that:

> The Town of Woodstock maintained policies and practices that caused Plaintiff's constitutional injuries: (a) routing kennel licensing approvals through NECCOG — the agency targeting Plaintiff — while authorizing Town payments to that same agency; (b) briefing Town officials on pre-raid planning at least thirteen days before the July 10, 2024 seizure; (c) coordinating financial responsibility for the seizure's costs; and (d) maintaining an ongoing relationship with NECCOG through which Town officials monitored, encouraged, and directed enforcement actions against Plaintiff.

(Proposed Second Am. Compl. ¶ 81.)

"Monell does not provide a separate cause of action . . . ; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional

violation." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). "[T]here can be no municipal liability where there is no underlying constitutional violation." Haslinger v. Westchester Cnty., No. 22-131, 2023 WL 219198, at *1 (2d Cir. Jan. 18, 2023).

With respect to Count II, the claimed underlying constitutional violation is "the unconstitutional seizure of Plaintiff's animals." (Proposed Second Am. Compl. ¶ 77.) Donovan argued in the state court action that the seizure of her animals was unconstitutional. See Donovan, 237 Conn. App. at 818 ("She contends that the judicial finding of probable cause for the search and seizure warrant rested in part on an affidavit detailing observations made by an animal control officer who peered through a window of her home during a welfare check and that such observation constitutes an improper search of the curtilage of her home, which does not meet the plain view exception to the fourth amendment's warrant requirement."). The Connecticut Superior Court denied her motion to suppress, and that ruling was not overturned. Therefore, Donovan is prevented by the doctrine of issue preclusion from relitigating this issue.

With respect to Count III, although the plaintiff asserts that the clauses (a) through (d) in ¶ 81 of the Proposed Second Amended Complaint describe "constitutional injuries," none of

them do. In addition, even if the plaintiff is attempting to allege that the constitutional injury is the unconstitutional seizure of her animals, as discussed above, she is prevented by the doctrine of issue preclusion from relitigating this issue.

Consequently, the plaintiff cannot plead facts that could establish a Monell claim in either Count II or Count III, because she cannot allege facts that could establish an underlying constitutional violation. Therefore, the amendments proposed in Count II and Count III are futile.

**C. Proposed Counts IV, V, VI and VII**

Count IV is a claim against Chandler Paquette in his individual capacity brought pursuant to 42 U.S.C. § 1983. The plaintiff alleges that:

> Paquette personally participated in the deprivation of Plaintiff's constitutional rights through the following acts: (a) receiving advance notice of the raid the evening of July 9, 2024; (b) engaging in real-time communications during the July 10, 2024 raid, including statements expressing approval of the seizure; (c) inquiring whether Plaintiff's animals were 'adoptable' within seven days of the seizure, before any forfeiture proceeding had concluded; (d) stating that 'the animals are the only way into that house,' revealing that the animals were a pretext for entry rather than the object of genuine welfare concern; (e) stating a preference for a predetermined outcome — 'hopefully this will end the situation and the dogs can find a better life' — before any judicial determination; (f) thanking Hutchins for what she had done 'on not just our behalf,' explicitly acknowledging Town direction of NECCOG enforcement; (g) exclaiming 'Here we go again!!' upon learning of the April 2025 seizure of a tenant's animals; and (h) continuing to monitor

> Plaintiff's litigation on official Town letterhead through at least October 2025.

(Proposed Second Am. Compl. ¶ 85.)

Count V is a claim against Jennifer Hutchins in her individual capacity brought pursuant to 42 U.S.C. § 1983. The allegations with respect to a violation of the plaintiff's constitutional rights by Hutchins are set forth in ¶ 88 of the Proposed Second Amended Complaint, and they are similar in nature to the allegations in ¶ 85 with respect to defendant Paquette.

Count VI is a claim against Jeremy DiPietro in his individual capacity brought pursuant to 42 U.S.C. § 1983. The allegations are similar in nature to the allegations described in ¶ 85 with respect to defendant Paquette, except that the plaintiff also alleges that defendant DiPietro "submitt[ed] a warrant affidavit containing physical observations that were impossible given his documented position at the time." (Proposed Second Am. Compl. ¶ 91.)

Count VII is a claim against Jim Rivers in his individual capacity brought pursuant to 42 U.S.C. § 1983. The allegations are similar in nature to the allegations described in ¶ 85 with respect to defendant Paquette.

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a

plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell, 436 U.S. at 690-91).

Donovan cannot plead facts that could establish deprivation of a constitutional or statutory right. As discussed above, she is prevented from relitigating both the issue of whether the seizure of her animals was unconstitutional and the issue of whether there was probable cause for the warrant pursuant to which her animals were seized.

Therefore, the amendments proposed in Counts IV, V, VI and VII are futile.

**D. Proposed Count VIII**

Count VIII is a claim that defendants Paquette, Hutchins, DiPietro, and Rivers engaged in a civil conspiracy in violation of 42 U.S.C. § 1985(3). The plaintiff alleges that: "The conspiracy was directed at Plaintiff as a member of a class — private animal breeders — that NECCOG and its co-conspirators have systematically targeted across multiple cases in this region, establishing the class-based animus required under § 1985." (Proposed Second Amended Complaint ¶ 97.)

"The four elements of a § 1985(3) claim are: (1) a

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (citing United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983)). "Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" Mian, 7 F.3d at 1088 (quoting United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 29 (1983)).

The proposed Count VIII fails to state a claim, among other reasons, because of the fact that "[t]he conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.' . . . But the term class 'unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.'" Dolan v. Connolly, 794 F.3d 290, 296 (2d Cir. 2015) (citing Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir.2007)). See also Turner v. Boyle, 116 F. Supp. 3d 58, 95 (D. Conn. 2015) ("[I]ndividuals are not

afforded protected class status under section 1985 on the basis of a desire to engage in specific conduct[.]”); Martin v. New York State Dep’t of Corr. Servs., 115 F. Supp. 2d 307, 316 (N.D.N.Y. 2000) (“‘[C]lass-based animus’ encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex.”). Consequently, the allegation that the class of which the plaintiff is a member is “private animal breeders” cannot support a § 1985 claim as a matter of law.

Therefore, the plaintiff’s factual allegations fail to state a legally cognizable conspiracy in violation of § 1985, and the amendment proposed in Count VIII is futile.

### E. Proposed Count IX

Count IX is a claim, brought pursuant to 42 U.S.C. § 1983, against defendants Hutchins, Rivers, Paquette, NECCOG, and the Town of Woodstock for violating Donovan’s First Amendment rights by retaliating against her. Donovan alleges:

> Defendants retaliated against Plaintiff for this protected activity through: (a) the sustained targeting campaign that culminated in the July 2024 seizure; (b) the April 2025 seizure of a tenant’s animals, timed to coincide with a critical juncture in Plaintiff’s criminal proceedings; (c) opposing counsel’s contact with Plaintiff’s tenants and disclosure of the tax lien; (d) Rivers’s public characterization of Plaintiff as someone requiring ‘a different kind of help’; and (e) Paquette’s letter to Dorrie Nang in October 2025 blaming Plaintiff for the continued custody of her animals.

(Proposed Second Am. Compl. ¶ 101.)

"To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015) (quoting Espinal v. Goord, 558 F.3d 119, 128 (2d Cir.2009)).

The plaintiff claims that the July 10, 2024 search of her home and seizure of her animals was retaliation. However, the plaintiff cannot plead a First Amendment retaliation claim based on the July 10, 2024 seizure because there was probable cause for the search and seizure. See Nieves v. Bartlett, 587 U.S. 391, 402 (2019) ("The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."); Hartman v. Moore, 547 U.S. 250, 258 (2006) ("It is . . . the need to prove a chain of causation from animus to injury, with details specific to retaliatory-prosecution cases, that provides the strongest justification for the no-probable-cause requirement[.]"). As discussed above, the plaintiff is prevented by the doctrine of issue preclusion from relitigating the issue of whether the seizure of her animals was unconstitutional and the issue of whether there was probable cause for the warrant pursuant to which her animals were seized.

The plaintiff claims that the April 2025 seizure of a tenant's animals was retaliation against her. That is merely a conclusory assertion. The fact that NECCOG executed an independent animal welfare action against a separate individual on the plaintiff's property, standing alone, does not support a reasonable inference that the named defendants retaliated against the plaintiff.

As to the disclosure of the plaintiff's tax liens by Carrie Burnsed, who was counsel for NCCOG in the state civil proceedings, Burnsed is not a defendant in this case.

Lastly, to the extent the plaintiff bases this claim on a statement by Rivers that Donovan "require[ed] a different kind of help" and Paquette's October 2025 letter, those alleged facts are insufficient as a matter of law to state a retaliation claim. See Zherka v. Amicone, 634 F.3d 642, 646 (2d Cir. 2011) ("Retaliatory insults or accusations may wound one's soul, but by themselves they fail to cross the threshold of measurable harm required to move government response to public complaint from the forum of free speech into federal court.").

Therefore, the amendment proposed in Count IX is futile.

**F. Proposed Count XIII**

Count XIII is a claim, brought pursuant to 42 U.S.C. § 1983, against defendants Hutchins, Rivers, NECCOG, Paquette, and the Town of Woodstock for violation of the plaintiff's

Fourteenth Amendment right to procedural due process.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." Reed v. Goertz, 598 U.S. 230, 236 (2023).

The plaintiff claims that:

> Connecticut General Statutes § 22-329a authorizes civil forfeiture proceedings for seized animals. As applied by NECCOG and the Defendants in this case, that statutory scheme resulted in a civil forfeiture judgment against Plaintiff before her related criminal trial has occurred.
>
> . . .
>
> Plaintiff faces permanent loss of her property and family based on proceedings tainted from the outset by a fabricated warrant, false veterinary testimony, and a conspiracy among government officials — none of which she has yet had the opportunity to fully litigate in a criminal forum.

(Proposed Second Am. Compl. ¶¶ 117-18.)

In support of her contention that her due process rights were violated because the civil forfeiture proceedings preceded her criminal trial, the plaintiff references a purported Connecticut Supreme Court case, "Town of East Haven v. Dancer," but does not give a citation. The court has been unable to find any such case.

In any event, the plaintiff had the opportunity to contest the issue of the validity of warrant, the truthfulness of the veterinary testimony, and the conduct on the part of government

officials during the proceedings in the state court. As referenced above, the Connecticut Superior Court conducted a series of evidentiary hearings, heard testimony, and issued a valid judgment vesting permanent ownership of the animals with NECCOG. This judgment was affirmed on the merits by the Appellate Court of Connecticut, and the Supreme Court of Connecticut subsequently denied certification. See Ne. Connecticut Council of Gov'ts Animal Servs. ex rel. Hutchins v. Donovan, 237 Conn. App. 812, cert. denied, 354 Conn. 940 (2026).

Therefore, the plaintiff cannot state a claim for violation of her right to procedural due process, and the amendment proposed in Count XIII is futile.

**G. Proposed Count XIV (Fourth Amendment Agency and Civil Conspiracy)**

Count XIV contains three claims against proposed defendant Scott Pempek for a Fourth Amendment violation and participation in civil conspiracy in violation of 42 U.S.C. § 1985; it also contains a claim against him for breach of fiduciary duty, which is discussed in Part III, H below.

The plaintiff claims that Pempek entered her residence in his professional capacity to conduct an appraisal, photographed the interior without her consent, and transmitted those photographs to NECCOG, which subsequently utilized them as the evidentiary basis for a search warrant application.

As discussed above, to the extent that the plaintiff challenges the validity of the search warrant and the seizure of her animals, she is prevented by the doctrine of issue preclusion from relitigating those issues.

In addition, the plaintiff fails to allege facts that could establish that Pempek acted as a government actor or agent. "[P]rivate actions are generally attributable to the government only where there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself." United States v. DiTomasso, 932 F.3d 58, 67-68 (2d Cir. 2019) (cleaned up). "The 'close nexus' test is not satisfied when the state merely approves of or acquiesces in the initiatives of the private entity[.]" United States v. Stein, 541 F.3d 130, 146 (2d Cir. 2008) (cleaned up). Such a nexus is found when the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Id. at 147 (cleaned up).

The plaintiff alleges that Pempek came to her house in his professional capacity as real estate appraiser "retained in connection with a potential sale of the property." (Proposed Second Am. Compl. ¶ 15 at 8.) She alleges that Pempek "photographed the interior of [her] home and transmitted those

photographs directly to NECCOG — the very agency [Donovan] had just told him was harassing her — without her knowledge or consent. Those photographs were used by Hutchins as the basis for a warrant application . . . ." Id. Thus, the plaintiff's factual allegations show that rather than coming to Donovan's house as an agent of the state and then reporting to the state, Pempek simply notified the state about the conditions under which the plaintiff's animals were being kept and sent photographs showing those conditions, based on what he saw in his capacity as an appraiser.

To the extent that the plaintiff seeks to plead a claim for civil conspiracy in violation of 42 U.S.C. § 1985, it fails as a matter of law for the reasons discussed above in Part III, D.

Therefore, the amendment proposed in Count XIV (Fourth Amendment Agency and Civil Conspiracy) is futile.

**H. Proposed Counts X, XI, XII and XIV (Breach of Fiduciary Duty)**

Counts X (defamation), XI (fraud and false testimony), XII (veterinary negligence and wrongful death of animals ) and XIV (breach of fiduciary duty) are all state law claims.

A district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d

Cir.2006); Smith v. Da Ros, 777 F. Supp. 2d 340, 366 (D. Conn. 2011). Because all the proposed federal claims are futile, the court would decline to exercise supplemental jurisdiction over the proposed state law claims, so the amendments proposed in Counts X, XI, XII, and XIV would not enable the plaintiff to proceed with her case in this court.

## IV. CONCLUSION

For the reasons set forth above, the plaintiff's Motion for Leave to File Second Amended Complaint Pursuant to Fed. R. Civ. P. 15(a)(2) (ECF No. 85) is hereby DENIED.

Because the court has denied the plaintiff's Motion for Leave to File Second Amended Complaint, the operative complaint is the Amended Complaint. However, the court has granted the defendants' motions to dismiss the Amended Complaint. (See Rulings on Mot. Dismiss, ECF No. 104.) Therefore, the Clerk shall close this case.

It is so ordered.

Dated this 16th day of November 2026, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge